IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LANDON RESER HOLMES and | ) | Case No. 16-41808 |
| SHERA MARIE HOLMES, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| KATIE McCLAMMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 16-4116 |
| | ) | |
| LANDON RESER HOLMES, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

Plaintiff Katie McClammer filed this adversary proceeding seeking a determination that an alleged debt owed to her by Debtor-Defendant Landon Reser Holmes is nondischargeable under 11 U.S.C. § 523(a)(2)(A) as a debt incurred by actual fraud. For the reasons that follow, judgment will be entered in favor of Ms. McClammer, but only as to the amount she advanced to Mr. Holmes on or before January 15, 2014.

## **Introduction**

Plaintiff Katie McClammer asserts that Debtor Landon Holmes pursued a romantic relationship with her in order to defraud her out of her savings and to incur additional debt for his benefit. In sum, the primary issues here are whether Landon's promises of a future relationship with Katie, and future repayment of the

funds, were fraudulent, and, if so, whether Katie's reliance on those promises were justifiable under the circumstances.  Plaintiff does not seek an award of damages here, but instead intends to pursue that in state court to the extent the debt is found nondischargeable here.

### **Factual Background**

#### *The Relationship*

Katie and Landon met in May 2013, when Landon came to work as a driver for Kansas City Fly Ash, where Katie was already employed as a sales coordinator. Soon after Landon came to work there, Katie was promoted to the position of driver-supervisor, which meant she became Landon's supervisor.  Both of them were married to other people at the time.  Over the summer of 2013, the two of them became more and more friendly, seeing each other almost daily and speaking on the phone, sometimes for hours at a time.  They confided in each other that they were unhappy in their respective marriages.  Katie was, in fact, considering a divorce at the time.  Landon told Katie in about August that he was also considering filing for divorce.  They expressed feelings for each other, eventually saying they loved each other.

At some point during the summer or fall of 2013, Katie filed for divorce, and Landon helped her move out of the house she shared with her then-husband. Although Landon remained living with his wife, he and Katie started seeing each other more frequently when Katie moved into her new place.

In September 2013, the relationship became romantic.  Landon told Katie he loved her, that they were soulmates, and that he wanted to marry her and have children together.  Katie clearly felt the same way.

### *The Financial Transactions*

In the late summer or early fall of 2013, at Landon's request, Katie obtained two new credit cards with him as an authorized signor.  In addition, in the fall of 2013, Katie began to give Landon money in the form of checks and cashier's checks.  Specifically, the evidence showed, and Landon does not dispute, that Katie gave him the following checks:

Check dated October 23, 2013 in the amount of $9,500, marked as "loan"

Cashier's check dated November 22, 2013 in the amount of $35,000

Check dated December 26, 2013 in the amount of $2,000

Check dated January 27, 2014 in the amount of $5,300, marked as "loan"

Check dated March 5, 2014 for $3,200, with the memo "Holmes Family Farm"

Check dated April 29, 2014 in the amount of $1,000

Check dated May 16, 2014 in the amount of $1,100

Check dated May 16, 2014 in the amount of $3,600

Check dated May 27, 2014 in the amount of $9,500

Check dated June 2, 2014 in the amount of $3,500

Cashier's check dated June 23, 2014 in the amount of $4,000, made payable to "Cross Tire"[1]

Cashier's check dated July 2, 2014 for $1,000, made payable to "Cross Tire"


Landon admits he received all of the foregoing funds, although he could not recall specifically what he used the advances for.

Note that two of the above-listed checks were dated the same day – May 16, 2014 – the first for $1,100, a second for $3,600.  The two checks are sequential in

---

[1] The significance of "Cross Tire" is discussed below.

3

number.  Katie testified that she had written Check Number 1042, in the amount of
$1,100, first, but Landon called and said she had written the check for the wrong
amount and that he had actually needed $3,600.  So, she says she asked him to
shred the first one, which he told her he did, and she wrote him Check Number
1043, for $3,600.  However, Landon did not shred the first check, but instead held
on to it and later cashed it on June 10, 2014.  Landon denies saying he would shred
the first check and says he told her when he was cashing it, although he had no
explanation whatsoever as to why she had written him the two checks on the same
day, or why he had held on to the first check for over three weeks.

In addition to the foregoing checks, in December 2013, at Landon's
suggestion, Katie started the process of taking out a $50,000 loan against her 401k.
As part of that transaction, in January 2014, she signed a five-year note with
$1,000 monthly payments.  She testified that she gave all of that loan money to
Landon.

Katie testified she withdrew an additional $70,000 from her 401k at some
point, which resulted in an early-withdrawal tax penalty.  She testified she did not
use any of these funds for her own purposes; rather, it all went to Landon.  She
testified she owes the IRS $20,000 as a result of this transaction.   Landon denies
he received these funds.

In addition to the money transfers, Landon told Katie that his pickup truck
was titled in his and his then-wife's name, and that he wanted to trade that vehicle
in so the wife's name would be off the title in connection with the divorce he said
he was getting.  As a result, sometime in early 2014, Katie purchased a 2010
Chevrolet pickup truck and trailer for the approximate amounts of $35,000 and
$28,000, respectively.  Although these vehicles were titled in Katie's name, she
bought them for Landon's exclusive use.  She testified he told her he would buy

4

them from her after his divorce was final.  Landon did not dispute that she bought these items at his request "for [their] life down the road," but he insists he made payments on these items while he and Katie were involved with each other.

Also, in March 2014, Katie obligated herself for the purchase of a 2013 Polaris RZR, an off-road recreational vehicle, for Landon to use in connection with his bike racing hobby.  Katie testified that this cost $18,000.  The Polaris is not a titled vehicle, but Landon conceded that Katie owned it, and was on the note. Landon testified that he made payments on this item while they were together, as well as putting his own money into making modifications to it.

Meanwhile, Landon was also using the two credit cards Katie had opened on which he was an authorized user.  Notably, in December 2013, he charged a cruise he took with his then-wife on one of Katie's credit cards.  He also used the cards to purchase several major appliances for the home he was sharing with his then-wife. There were also charges for racing expenses, clothes, restaurants, and a golf cart. When Katie confronted him about these charges, Landon said he had used her credit cards by mistake.  And, when specifically confronted about the cruise with his wife, Landon said it was a cruise he and his wife had planned to go on with his parents.  Katie says she later learned that his parents did not go on a cruise with Landon and his wife.  Indeed, if he had "planned" to go on the cruise previously, he had not paid for it, since he used Katie's credit card to do so.

Katie also testified that, at some point not clear in the record, she learned that Landon had pled guilty in the summer of 2013 in a criminal case for passing bad checks.  Although the record is not clear how much of her money went toward his restitution, they both testified that the two cashier's checks made payable to "Cross Tire" listed above were paid toward a restitution payment.  Specifically, Katie testified that Landon had been arrested for violating his probation

(apparently by failing to make a restitution payment) and that she hand-delivered the checks to Landon's attorney to get him out of jail.

In about July 2014, Katie's divorce was final. She conceded at trial that she had concealed from her husband, and the divorce court, that she had by then purchased the vehicles in her name for Landon's.

Katie testified that she advanced most of the funds so that Landon could clear up "his side of the bills" in order to facilitate his divorce. Katie testified that she had told him early in the relationship that she and her then-husband were debt-free and that Landon knew she had received a severance from a former employer. She testified that Landon told her he had inherited two CDs from his grandfather, one in the amount of $20,000 and another in the amount of $43,000, and that he would repay her when they came due and could be liquidated. She says he also told her he would refinance his house in connection with his divorce, and would have an additional $50,000 from that refinancing to repay her. She says he also drove her by a piece of property in Blue Springs, Missouri, which he said he owned and would sell to repay her, although she later learned he did not actually own the property. She also says he told her he had taken out a life insurance policy which would pay her if something happened to him. Katie testified that, every time Landon asked her for money, she became upset, but he reassured her by using the phrase, "love, trust, and faith."

Landon disputes much of this portion of Katie's testimony, saying he did not know that she had funds available, nor did he *ask* her for financial assistance; rather, he says she *offered* it to him to help facilitate his divorce and satisfy his restitution obligations. He denies telling her he owned the Blue Springs property; rather, he says he told her his parents were buying it and that he wanted to build a house there. He also denies telling her he would repay her from the CDs, which he

6

says were actually his mother's.  Although he acknowledges using the phrase "love, trust, and faith" in conversations with her, he says they never discussed repayment terms and that she in fact always said they would just "work it out" after they were together.

Although it is not entirely implausible that Katie may have said they'd work out parts of the finances after they were together, there was evidence that, by December 2013, Katie was concerned about how she was going to make payments on the two credit cards she had taken out for him to use.  That month, the parties wrote out an itemization of his and her expenses.  Because Katie was Landon's supervisor at work, she knew what his income was.  But, she testified, she wanted to make sure he had the disposable income with which to pay her until his purported CDs could be cashed out.  Landon also testified that he prepared the budget to show her he could pay her back for the expenses she was incurring on his behalf.  This budget indicated that Landon was going to pay $500 toward each of the two credit cards each month.

Around the time the vehicles were purchased, in about March 2014, the parties made a revised itemization indicating that Landon was to make the truck, trailer, and Polaris payments, plus pay $500 toward each of the credit cards each month, plus pay an additional $1,000 to Katie so she could make the payments on the $50,000 401k loan she had by then taken out.  Again, Landon testified he did this to show her he could make the listed payments.

In June of 2014, at Landon' suggestion, the couple opened a joint checking account.  Landon testified he suggested the joint account so Katie could see what was going on.  He began to put $500 per week as a direct deposit from his paycheck into that account to cover some of the payments he was supposed to make, but Katie testified that he was actually taking more out of the account than

he was putting in.  Landon could not recall specifically, but he did not dispute that he took out more than he put in.

In August 2014, Katie discovered she was pregnant.  She wanted to keep the baby, but Landon convinced her to terminate the pregnancy because, he said, neither of them was in a position to have a baby at that time.  He told her he believed his parents would never accept the baby, inasmuch as he was still married.  Further, he told her the pregnancy would adversely affect her other children at school and that her husband could use it to take her children away from her.  She says he told her they would have children together in the future, but they could not have this child.  She relented, and he accompanied her to the appointment to terminate the pregnancy on September 5, 2014.

Both parties testified that the pregnancy caused significant strains in the relationship.  She says communication from him started to slow down in September.  He says she began harassing him with late night, profanity-laced phone calls.  Nevertheless, despite the fact that the relationship was by then on the rocks, Katie testified that she "got access to" her pension at the end of September 2014 and cashed out $23,000 from that.  Although Landon denies receiving any of this money, Katie testified she put those funds into the joint bank account and that Landon withdrew all of it.

At around that same time, Landon asked Katie to help him find another job because, he said, he was afraid she would be fired because of the relationship.  She put him in contact with another employer, and he took another job in early October.  They testified they also had their last romantic encounter in early October, after which, he ceased communicating with her altogether.  "He vanished," she said.  He says she "changed" after she became pregnant, as evidenced by the harassing and threatening phone calls, and that he simply no

8

longer wanted to be in a relationship with someone who behaved that way. Landon said Katie continued to try to contact him after October, telling him these problems could all go away, even the financial issues, if he would come back to her. However, by mid-October, the relationship was over.

At that point, Katie says she realized that pretty much everything Landon had told her was a lie. He did not have any CDs; rather, they were in his mother's name and the mother was not planning to give the money to him anytime soon. He never had a life insurance policy. He had more criminal problems than the one bad check restitution case she knew about. She also points out that, despite his representations that he was using the money to facilitate his divorce, he never did file for divorce against his wife. In fact, *the wife* filed divorce against *him* in November 2014, which, Landon says, happened after Katie informed her of the affair.

By February 2015, Katie demanded that Landon return the truck, trailer, and Polaris to her. They arranged for the transfer in a parking lot in Blue Springs. Landon did return the truck and trailer to that parking lot. However, he did not return the Polaris because he had already sold it in about December 2014, via Craigslist for $10,500 cash.[2] Although Landon acknowledged that Katie owned the Polaris, and a financing company had a lien on it, he kept all of the sale proceeds. He said he did so because he had spent $10,500 of his own money making modifications to it. However, as counsel pointed out on cross examination, he had not paid one of the shops which did the work on the Polaris, and it obtained a judgment against him. In any event, in perhaps February 2016, Katie filed a police report asserting Landon had stolen the Polaris.

---

[2] The Polaris is not a titled vehicle; rather, it is covered by a Certificate of Origin.

9

In addition, when Katie went to sell the truck and trailer, she learned that Landon had not paid the property taxes on them and had instead put license plates from other vehicles on them. Between the taxes and depreciation, Katie lost about $6,000 on those two vehicles.

In all, Katie says she has been harmed in the amount of $275,000. Landon says he received less than $100,000 from her.

## Nondischargeability Under 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code provides that a discharge under § 727 does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud."[3] "False pretenses, false representations, and actual fraud are three separate elements."[4] Here, Katie pled only that Landon had committed actual fraud.

"'Actual fraud' was recently defined by the United States Supreme Court in *Husky Int'l Elec., Inc. v. Ritz*,[5] to encompass anything that counts as fraud and is done with wrongful intent, including fraudulent conveyances, which do not require a misrepresentation from a debtor to a creditor."[6]

> "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of

---

[3] 11 U.S.C. § 523(a)(2)(A).

[4] *Hasley v. Irons* (*In re Irons*), 2016 WL 4991474 at *4 (Bankr. D. Neb. Sept. 16, 2016) (slip copy).

[5] ___ U.S. ____, 136 S.Ct. 1581, 194 L.Ed. 2d 655 (2016).

[6] *In re Irons*, 2016 WL 4991474 at *4.

bad faith or immorality." Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."[7]

Prior to the Supreme Court's decision in *Husky International*, courts traditionally held that, in order to prevail on a nondischargeability cause of action under § 523(a)(2)(A), the plaintiff must prove, by a preponderance of the evidence: (1) that the debtor made representations; (2) that at the time he made the representations he knew they were false; (3) that he made such representations with the intention and purpose of deceiving the plaintiff; (4) that the plaintiff justifiably relied on such representations; and (5) that the plaintiff sustained the alleged loss and damages as a proximate result of the representation having been made.[8] Although *Husky International* expanded the scope of "actual fraud" under § 523(a)(2)(A), these traditional elements, on which the parties focus here, remain relevant in the analysis.[9]

## *False Representations*

Katie asserts two primary categories of misrepresentations by Landon: first, that he told her he loved her, was going to divorce his wife, and was going to start up a life with her; and second, that he would repay her the funds she advanced to help facilitate his divorce.

At the outset, I would mention that Landon was resolute at trial that he actually did love Katie. Perhaps he did. But his feelings for Katie are not

---

[7] *Husky Int'l Elec.*, 136 S.C.t at 1586 (quoted by *In re Irons*, 2016 WL 4991474 at *4).

[8] *See In re Ophaug,* 827 F.2d 340 (8th Cir. 1987), as supplemented by *Field v. Mans*, 519 U.S. 59, 116 S. Ct. 437, 444, 133 L.Ed.2d 351 (1995); *In re Moen*, 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999).

[9] *See, e.g.*, *In re West*, 2017 746250 at *24-25 (Bankr. W.D. Mo. Feb. 24, 2017) (applying the factors post-*Husky International*).

11

determinative here because, unfortunately, people sometimes take advantage even of people they care about.  Rather, the relevant questions here are whether Landon meant it when he said he was using the money to facilitate his divorce and their future life together, and whether he misrepresented that he planned to repay her.

With regard to repayment, Landon did not expressly refute Katie's testimony that he told her he would refinance his home in his divorce and give her $50,000 from that.  Nor did he refute her testimony that he said he had taken out a life insurance policy.  I find that he did make those representations, and that they were false.  Further, although Landon denied telling Katie that he would repay her from his mother's CDs when they matured, I find Katie's testimony that he did make that representation to her – regardless of who he told her actually owned the CDs – and that that representation was false.

I also find that Landon misrepresented to Katie that he had shredded the first May 16 check.  Katie's version of those events was credible, and Landon essentially had no explanation to contradict her on this point.  His waiting nearly a month to cash that check, with no explanation whatsoever, is further evidence that the statement that he had shredded it was false when he made it.  Similarly, I find Landon's explanation that he "accidentally" charged the appliances and the cruise on Katie's credit cards to be patently false.

In addition, although Landon asserted at trial that he and Katie never discussed repayment terms, and that she said they would just work things out after they were together, Landon did not dispute that he was at least supposed to make payments on the credit cards, the vehicles, and $1,000 per month toward the $50,000 loan from her 401k, which testimony is borne out in the handwritten budgets they drafted.  However, based on the March budget, Landon was obligated to make payments totaling $3,450 toward the vehicles, credit cards, and the 401k

loan, but he was only depositing $2,000 a month into the joint account to make those payments.  Landon testified that he occasionally put additional funds in the account, but there was no evidence of that, and he could not dispute Katie's assertion that he was consistently taking more money out of the account than he was putting in.  Despite the fact that he kept promising to make payments, he never put in enough funds to do so, and at the same time was borrowing more and more money from Katie.  I find, based on those circumstances, that his representations that he was going to make the $3,450 in monthly payments were false.

Finally, with regard to their future life together, Landon himself testified that he told Katie, on several occasions, that he was planning to divorce his wife and that he intended to marry Katie and have a family with her.  He also represented to Katie that he was using the money she gave him to make that happen.  However, there was no evidence that he used *any* of the money for that purpose and, in fact, except for the Cross Tire checks for his restitution payment, Landon could not recall specifically where any of the money went.  Indeed, although Landon allegedly spent an entire year – and a lot of money – supposedly settling his bills, he never actually filed for divorce, despite his representations that he planned to do so.  As with his testimony that he loved Katie, Landon was rather emphatic at trial that he did intend to have a future with her.  Again, perhaps in some vague and amorphous manner, that was not a total lie.  However, I find his representations to her that he was using the money toward that end were false.

### *Intent*

I find that Landon made the foregoing misrepresentations with the intent to deceive Katie and obtain money from her.   As Landon points out, since he does not admit he intended to deceive Katie, the only evidence of his intent is

circumstantial.  However, because direct proof of intent is nearly impossible to obtain, a debtor's fraudulent intent "may be, and often must be, shown by circumstantial evidence."[10]

Landon cites *Alexander v. Inland Steel Co.*,[11] which said:

> Under Missouri law, the only qualification [of relying on circumstantial evidence] is that the evidence must rise above the stature of guesswork, speculation, and conjecture, and must point to the desired conclusion with such a degree of certainty as to make the particular conclusion more reasonable and probable than any other that might be drawn.  This for the obvious reason that if the circumstances afford no more than an equal basis for two or more inconsistent conclusions as to the existence of the essential fact, then in that event the party having the burden of proof may not be said to have sustained his obligation.[12]

He asserts that other reasonable conclusions, besides trying to take Katie's money, can be drawn from his representations to her.  That may be true when viewing one or two of the representations in isolation.  However, taking the representations as a whole, and viewing them in the context of the affair, the lack of evidence that he was using the money to facilitate his divorce, his never actually filing for divorce, his compounding criminal restitution obligations, and his sudden change of heart when she got pregnant and the money ran out, the conclusion that Landon was lying to Katie at least in part for her money is indeed more reasonable and probable than any other that might be drawn.  I find, therefore, that Katie has

---

[10] *In re Armstrong*, 498 B.R. 229, 237 (B.A.P. 8th Cir. 2013) (in the context of an action under § 523(a)(4); *see also In re Villalobos*, 462 B.R. 712, 718 (Bankr. S.D. Iowa 2011) (citations omitted).  *James v. West* (*In re West*), 2017 WL 746250 at *24 (Bankr. W.D. Mo. Feb. 24, 2017) (slip copy) ("[D]irect evidence of intent is rare" in these cases, and "a court may accept surrounding circumstances that create an inference of an intent to deceive the creditor.") (citing *In re Schnuelle*, 441 B.R. 616, 622 (B.A.P. 8th Cir. 2011).

[11] 263 F.2d 314 (8th Cir. 1958).

[12] *Id.* at 320.

14

proven, by a preponderance of the evidence, that Landon made the misrepresentations with the intent to deceive her into giving him the money.

## *Justifiable Reliance*

"The Supreme Court has held that the standard to be applied to exceptions to discharge for actual fraud under § 11 U.S.C. § 523(a)(2)(A) is 'justifiable reliance,' which is a lower standard [than] 'reasonable reliance.'"[13]  "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation."[14]  Quoting the Restatement (Second) of Torts, the Supreme Court said:

> [I]f one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect.  On the other hand . . . a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.[15]

Further:

> Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the

---

[13] *In re Treadwell*, 423 B.R. 309, 314 (B.A.P. 8th Cir. 2010), *rev'd on other grounds,* 637 F.3d 855 (8th Cir. 2011).

[14] *Field*, 516 U.S. at 71, 116. S.Ct. at 444 (quoting Rest.2d Torts § 540); *Treadwell*, 423 B.R. at 314.

[15] *Field*, 515 U.S. at 71, 116 S.Ct. at 444 (quoting Rest.2d Torts § 541, Comment a); *Treadwell*, 423 B.R. at 314.

15

circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."[16]

However, "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him."[17]

Although a plaintiff is not required to conduct any investigation as to the truth of a debtor's representation, "[t]here is a 'red flag' exception . . . for extreme situations such as the one-eyed horse or where a debtor tells the creditor he will not be able to repay his debt."[18]  "The rationale for placing this relatively low burden on the victim of the misrepresentation is rooted in the common law rule that the victim's contributory negligence is not a defense to an intentional tort."[19]  "In such circumstances, the equities weigh in favor of giving the benefit of the doubt to the victim, careless as it may have been, and even though it could have been more diligent and conducted an investigation."[20]

Although there was scant evidence presented concerning Katie's educational background, she is not financially unsophisticated.  She had been promoted to a supervisory position at work.  And, prior to meeting Landon, she appears to have been relatively savvy in her personal finances, as evidenced by the facts that she had a savings from a severance payment, a 401k, a pension, and that she and her now ex-husband were essentially debt free.[21]  She also asked Landon to sit down and work out budgets for paying the credit cards, vehicles, and the 401k loan.  In

---

[16] *Field*, 515 U.S. at 70-71, 116 S.Ct. at 444; *Treadwell*, 423 B.R. at 314.

[17] *Treadwell*, 423 B.R. at 315 (quoting Rest.2d Torts § 541).

[18] *Id.*

[19] *Id.* (quoting *Sanford Institution for Savings v. Gallo*, 156 F.3d 71, 74 (1st Cir. 1998)).

[20] *Id*. (quoting *Sanford*, 156 F.3d at 74).

[21] Katie testified that they were debt-free, except for their home mortgage and a small student loan.

addition, she articulately described the repayment terms on the loan she took from her 401k and the tax consequences of taking the $70,000 withdrawal from it.

But Katie was also very much in love with Landon.  It is not at all uncommon for people to look back with regret on decisions they made when they were newly-in-love.  That was undoubtedly a part of Katie's unique qualities and characteristics in the summer and fall of 2013.  With those qualities and characteristics in mind, it is understandable that Katie did not see, at least initially, that Landon was using her, even though it is now obvious in hindsight that he was. As a result, I find that Katie's reliance on Landon's representations in the summer and fall of 2013 was justifiable, given her unique qualities and characteristics and the circumstances of the relationship at the time.

But at some point along the way, Landon became the proverbial horse-with-one-eye, and Katie should have seen that he was lying to her.  I conclude that, certainly when she discovered he had charged the appliances and the cruise with his wife to her credit card, she could no longer ignore the obvious nature of his misrepresentations to her.

More specifically, Katie testified that, when Landon told her he was *going* on the cruise with his wife, she (logically) asked him, if he was getting a divorce, why was he going on a cruise with his wife?  She said his response was that they had planned to go on the cruise with his parents.  She then testified that, after he returned from the cruise, she checked her credit card activity and discovered that the cruise had been charged to her.  When confronted with that, and the charges for the appliances, he responded that he had "accidentally" charged them to her credit card.  That response was ridiculous.  More to the point, Katie at that point was no longer justified in relying on that explanation.  By then, in addition to using her credit card for the cruse and appliances for the house he shared with his wife, (i)

17

Katie had already given Landon $46,500 from her savings in a matter of two months; (ii) he had asked for, and they had started the paperwork for, an additional $50,000 loan from her 401k; (iii) he was racking up charges on her credit cards; and (iv) he was not correcting the "accidental" charges by immediately paying her for them.   I find that, by that time, it should not have required any further investigation for Katie to have figured out that she was being duped, and should stop giving him money.

Indeed, the evidence was that Katie was starting to question things at that point because it was at about that time that she asked Landon to sit down and discuss their respective budgets.  She expressly testified that she asked him to do this because she wanted to make sure what he was saying was true, and that he had enough money to pay her until the CDs came due.   Pretty clearly, she was becoming concerned he would not be able to repay her and she, in turn, would not be able to make the payments on the obligations she was incurring on his behalf. Katie's reliance on his misrepresentations after that point was not, I find, justifiable.

Katie is essentially arguing that the justifiable reliance test is entirely subjective, that was she blinded by her love for Landon, and that she was therefore justified to rely on his statements, even though she had caught him in numerous lies in the past.  But that simply cannot be the standard:  "Justifiable" must mean *something*.  I recognize that there is no duty to investigate under the justifiable reliance standard, but, as the Supreme Court indicated, when a person is presented with a horse with one eye, that person has an obligation to at least look at the horse.  Since she continued to look away, even after she learned he had used her credit cards for the cruise and appliances, all for the benefit of his wife, any funds extended after those transactions were not extended with justifiable reliance.

18

*Damages*

Clearly, Katie was damaged as a result of Landon's actions.  It's not entirely clear from the record, however, precisely how much Katie had given Landon by mid-January (when her reliance was no longer justifiable), and Katie is not asking this Court to enter a monetary judgment.  She intends, rather, to obtain the money judgment in state court, and asks that this Court declare the money judgment nondischargeable.  Therefore, whatever amount the state court determines Landon received from her on or before January 15, 2014 is nondischargeable as a debt obtained by actual fraud pursuant to 11 U.S.C. § 523(a)(2)(A).

An Order in accordance with this Memorandum Opinion will be entered this same date.


Dated: May 4, 2017                           /s/ Arthur B. Federman
                                                      Bankruptcy Judge

19